UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - FLINT

F<small>REDERICK</small> M. S<small>HARP</small>,

          Plaintiff,         Case No. 06-11662

vs.                             H<small>ONORABLE</small> J<small>UDGE</small> G<small>EORGE</small> C<small>ARAM</small> S<small>TEEH</small>
                                  H<small>ONORABLE</small> S<small>TEVEN</small> D. P<small>EPE</small>

M<small>ICHAEL</small> J. A<small>STRUE</small>,
Commissioner of Social Security,

          Defendant.
=========================/

## Report and Recommendation

**I.**    **Background**

Frederick M. Sharp ("Plaintiff") brought this action under 42 U.S.C. § 405(g) for judicial review of the Commissioner's final decision denying his application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. Both parties have filed motions for Summary Judgment, which have been referred pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the following reasons, it is **R<small>ECOMMENDED</small>** that Plaintiff's Motion for Summary Judgment be **D<small>ENIED</small>** and Defendant's Motion for Summary Judgment be **G<small>RANTED</small>**.

    **A.**    **Procedural History**

Plaintiff's August 28, 2002, application alleges disability due to Asperger's Syndrome, depression, borderline intellectual functioning (suspected) and problems with social interactions, beginning May 26, 2002, (R. 63-65, 101). Plaintiff's claims were initially denied on February 6, 2003, and he requested a hearing (R. 32-36).

1

Administrative Law Judge (ALJ) Barbara J. Welsch conducted a hearing on May 12, 2005. Plaintiff was represented by attorney, Terrence H. Bloomquist, and Vocational Expert (VE) James Lazer testified (R. 402-407). On November 9, 2005, the ALJ issued an opinion denying Plaintiff's applications (R. 14-29). The Appeals Council denied Plaintiff's request for review on February 9, 2006 (R. 7-9).

  **B.**   **Background Facts**

    **1.**   **Plaintiff Testimony**

    *Disability Application*

Plaintiff was born July 1, 1970, and was thirty four years old at the time of his hearing (R. 375-6). He has a high school diploma and an associates degree in the field of culinary arts (R. 377). In the past, Plaintiff worked at various jobs preparing foods at places such as pizza parlors, a bakery, a deli counter, fudge shop and fast food establishments, stocking items at clothing stores, taking tickets at a movie theater, bagging groceries at Kroger's and driving a truck for a bread company (R. 378-382). At the time of the hearing he worked 24 hours per week at Wal-Mart as a stock person Plaintiff reported that his other activities include mowing the lawn, bathing himself, attending local festivals, working on the computer, volunteering at the Habitat for Humanity thrift shop, gardening and he also enjoys a quilting class offered at a local church (R. 389-392, 169).

At the time of the hearing he lived with his parents in their home located in Grayling, Michigan, though at other times he had resided by himself (R. 392-393).

    *Testimony at Hearing*

At the hearing, Plaintiff reported this job history to the ALJ working at Big Lots stocking shelves, a bakery, pizza parlors, Norman's discount clothing store, the Hops 'n Schnapps's deli counter, Burger King, pretzel shop, fudge shop, Michigan Statue University residential hall dinning facility, Termini's bakery as a truck driver, United Artists Theater as a ticket taker, Kroger's as a bagger, Big Lots retrieving carts, and currently at Wal-Mart's stocking shelves (R. 377-385). Prior to the disability time frame in this case, he twisted his knee while employed at Dunkin' Donuts in 1991 (R. 376-377).

Upon being asked what kind of problems prevented him from working, Plaintiff replied that he does not have a problem (R. 386-387). When asked what, if anything, would prevent him from working a forty-hour work week, the Plaintiff could not provide an answer other than "I don't know," or "I have no idea." (R. 401).

The ALJ attempted to better understand the causes for sporadic employment asking the Plaintiff what other reasons exist for leaving the job. Plaintiff simply did not know and could not articulate why one day he would feel like going to work and the next day decide not to attend (R. 387, 395). Later in the hearing, Plaintiff explained that he left his job on the east coast to move back to Michigan to seek other employment. Upon his return to Michigan he found other work and was able to rent his own apartment (R. 387). After quitting the new job in Michigan, he then returned to live with his parents (R. 387).

The ALJ then inquired into Plaintiff's typical week. He arose daily at eight o'clock and bathed himself. Three days a week he worked his job from 11 a.m. until 8 p.m. He volunteered at Habitat for Humanity's resale store on the remaining 2-3 days of

the week (R. 389, 391). Plaintiff has a driver's licence and drives his own car every day. On occasion, Plaintiff fixes his own meals though his mother does most of the cooking as well as the laundry, dishwashing and grocery shopping (R. 389-390). Plaintiff volunteered that he enjoys digging in his vegetable and flower garden (R. 389-390). A year before the hearing, he visited family in New Jersey with his brother driving out and Plaintiff returning home to Michigan by bus (R. 391-392).

The ALJ then made inquiries into Plaintiff's assessments as to his own mental health status (R. 396-399). Plaintiff informed the court that in May of 2004, he committed himself to the hospital for being paranoid in regards to his health (R. 397-398). As to the specific manifestations or obsessions of the paranoia, Plaintiff could not provide further insights. Plaintiff was under the care of a psychiatrist, Dr. Kenneth Parada who prescribed Paxil to quiet his anxiety or as he stated the wanted effect of the medication to be to calm his nerves (R. 398-399). Plaintiff continued to take Paxil under the supervision of Dr. Ashley increasing the dosage from 12 milligrams to 33 milligrams over a period of a few years who then terminated the medication over concerns of liver enzyme functioning (R. 398).

### 2. **Medical Evidence**

On March 22, 2002, a psychological assessment of the Plaintiff was performed at the Hiawatha Behavioral Health facility by Earl Rorick, M.S., LLP, and signed by Dr. Robert McElhaney, M.D., finding Plaintiff to possess a Global Assessment of Functioning ("GAF") of 58 (R. 138-140)[1]. Plaintiff reported to the facility that he had a

---

[1]The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, (4th ed.1994) at 30. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or

4

depressed mood, boredom, sleep disturbance and did not like living in northern Michigan during the winter. It was found that he appeared to have a borderline intellect with poor insight, but was capable of possessing to goal to become less depressed. In furtherance of this goal, psychotherapy was recommended using solution-focused treatment for a moderate length of time (R. 139).

After a few months of treatment, Plaintiff was discharged from the facility on September 6, 2002, achieving many gains including his articulation of wanting to work full time in a larger city with more opportunities than there appeared to be to him in the small town of St. Ignace, Michigan (R. 136). Plaintiff appraised his functioning level to be "alright" (sic) but that he, along with his mother's assistance, wanted to work on other issues including pursuing Social Security Disability benefits. Plaintiff was diagnosed with Axis I Asperger's Disorder and suspected borderline intellectual functioning on Axis II (R. 136).

Ten days later on September 16, 2002, Plaintiff was assessed at the North Central Community Mental Health Center by Jeanne Gray, M.A., C.S.W. on Axis I with a pervasive development disorder NOS and depressive disorder, "ruling out Asperger's" (R. 159). Plaintiff's strengths as noted in the report were that he was a hard worker, a good conversationalist, gets along well with co-workers, enjoys close family relationships, and attends movies and craft shows (R. 150).

---

others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *See id.* at 32. A GAF score of 31-40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood." *Id*. A GAF of 41 to 50 means that the patient has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." *Id*. A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning. *Id*.

5

On January 24, 2003, Douglas Halgren, Ph.D., L.P., performed a psychological evaluation for the State of Michigan (R. 168). Dr. Halgren diagnosed Plaintiff to suffer from an autistic disorder and psychosocial stressors with a GAF score of 45. As to the Plaintiff's mental status, Dr. Halgren found the Plaintiff to be in contact with basic reality issues, orientated to time, person and place, able to perform basic mathematical calculations, cite to current events, make comparisons, and of average self-esteem, but he lacked the ability to relate to others in a usual manner appearing aloof with marked impairment in non-verbal behaviors such as poor eye contact, facial expression and gestures. (R. 169-170). The doctor concluded that Plaintiff suffered from an autistic disorder on Axis I (R. 171).

On March 16-18, 2003, Plaintiff was admitted to the hospital for complaints of chest pain to rule out an acute coronary syndrome, depression and obesity (R. 218). During the three days of observation, Plaintiff suffered from vomiting and a headache symptoms resembling a migraine attack. When Plaintiff was released from the hospital on the third day, he was able to exercise, eat well and had no headache, nausea or vomiting (R. 218).

Dr. Becky Ashley, on July 1, 2003, increased Plaintiff's Paxil from 12.5 mg to 25 mg noting he was "doing really well" (R. 247). On July 31, she continued his Paxil to decrease Plaintiff's anxiety and panic attacks and noted that he was doing "a little better" (R. 246). On September 30, 2003, Plaintiff saw Kevin Batterbee, D.O. for a medication review. He continued Plaintiff on Paxil 25 mg (R. 265). Dr. Batterbee assessed Plaintiff as likely having Asperger's Disorder, Depression NOS, Anxiety Disorder NOS and possible Obsessive Compulsive Disorder. Plaintiff's mother accompanied him to the

appointment and informed the doctor that the Plaintiff was taking testosterone ordered from the internet to help him build muscles. Dr. Batterbee admonished the unregulated use of such a hormone and Plaintiff assured him that he would stop its usage. Further, Plaintiff informed Dr. Batterbee that his depression was fine, overall he was doing well and no longer suffered from sleep, appetite, energy or concentration problems (R. 265).

On December 4, 2003, Kenneth A. Parada, M.D., performed a medication review a couple weeks after Dr. Ashley increased the Pal to 37.5 mg/day (R. 26). Dr. Parada concluded that the increased dosage worked well for the Plaintiff and prescribed continued usage of the medication at that level. He attributed Plaintiff's improved condition to his taking the medication consistently which most likely was not the case a couple of months prior to the medication review (R. 262).

On June 21, 2004, Dr. Parada wrote Plaintiff's attorney an evaluation for the social security disability benefits claim. He acknowledged that the Plaintiff could work eight hours per day but given a diagnosis of Asperger's Disorder it would be unlikely that Plaintiff would be able to continue any given position for a sustainable length of time (R. 259). The depression and anxiety, which were secondary to the Asperger's Disorder, contributed to Plaintiff's inability to sustain long-term employment (R. 259). On the attached forms, Dr. Parada noted that Plaintiff's abilities to interact appropriately with the general public and maintain socially appropriate behavior ranged from poor or none to fair (R. 261).

M. Bachman-Moran MA, LLP of the Northern Michigan Community Mental Health Services evaluated Plaintiff on December 6, 2002, to assess his intellectual and functioning abilities (R. 358-363). Plaintiff's intelligence was found to be in the normal

range and in the superior range in the area of information namely the acquisition of general knowledge and long term memory. It was deficient in arithmetic and block design, i.e., understanding spatial relationships (R. 259-260). Ms. Bachman-Moran noted that Plaintiff was highly motivated during the assessment working – diligently on all of the tests presented, displaying good social interactions such as engaging in conversations, showing a sense of humor and displaying emotional affects consistent with his feelings e.g., smiling for success.

As to adaptive functioning, Plaintiff was able to communicate verbally in full and complex sentences; he possessed the ability to take care of himself on a daily basis such as maintaining his own apartment, cook and clean, plan and prepare meals, make and receive phone calls, make and keep appointments without assistance, drive his own car and find employment (R. 360-361). Socially, the Plaintiff was found to be fairly comfortable in new situations. As an example of this, Plaintiff sought out a quilting guild in the area and is now an active member of the guild (r. 361). In conclusion, Ms. Bachman-Moran found that the Plaintiff did not qualify for services as a person with developmental disabilities (R. 362-363). Nor did he appear to qualify for services from an outpatient program. He possessed "quite a potential for finding full time employment."

### 3. **Vocational Evidence**

VE James Lozer appeared and testified that Plaintiff's past jobs as a bagger, ticket taker, packer, dishwasher, stocker and attendant were light or medium, unskilled labor (R. 403). The ALJ asked the VE to give examples of unskilled, entry-level jobs and the number of such jobs that exist in the State of Michigan (R. 403). The VE

testified that there were 40,000 jobs available in the medium unskilled category and 10,000 in the light unskilled category (R. 403-404).

Plaintiff's attorney asked the VE a hypothetical question that assumed an individual who cannot accept instructions or criticisms from supervisors, cannot get along with coworkers, exhibits behavioral extremes in response to routine work settings and cannot deal with normal stress (R. 406). Given those restraints, VE Lozer responded that no job in the economy exists for an individual fitting that description (R. 407).

### 4. ALJ Welsch's Decision

ALJ Welsch found that Plaintiff met the insured status requirements of the Social Security Act through November 9, 2005, but had engaged in part-time work since the alleged onset date, including working at Wal-Mart three days a week at the time of the hearing (R. 18-19). She found that the medical diagnoses of Asperger's Disorder, depression, anxiety, possible borderline IQ and migraine headaches indicate "severe" impairments within the meaning of the Regulations, but that they do not meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 (R. 19). The ALJ assumed for the purposes of the decision that the claimant suffered from each and every mental disorder mentioned in the record and accordingly considered the Plaintiff's actual functioning as it related to the mental health Listings (R. 24). In light of Plaintiff's ability to function with no more than a moderate degree of limitation with respect to maintaining concentration, a mild or slight degree of limitation with respect to his daily living and maintenance of his social function and a lack of repeated episodes of decompensation, the Plaintiff did not meet or equal the "B" or "C" criteria of any Listings (R. 24-25).

ALJ Welsch found that Plaintiff retained the residual functional capacity ("RFC") to perform work at the medium, light and sedentary exertional levels limited by Plaintiff's knee pain (R. 26-27). She found that Plaintiff retained the RFC to return to his past employment of bagger, packer, dishwasher, stocker and attendant, and found further that Plaintiff was qualified to work at approximately 70,000 jobs in the state of Michigan. (R. 28). In determining Plaintiff's RFC, ALJ Welsch accorded little weight to Plaintiff's version of his symptoms such that they would prevent him from performing the mental aspects of unskilled, routine and repetitive work and the physical aspects of medium, light and sedentary works excluding climbing ladders, ropes or scaffolds (R. 26). Based on Plaintiff's RFC, the ALJ concluded that the Plaintiff was not disabled within the meaning of the Social Security Act.

## II. Analysis

### A. Standards of Review

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Shisrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.

*Mullen v. Brown*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

### B. Factual Analysis

In his motion for summary judgment, Plaintiff argues that ALJ Welsch's decision finding Plaintiff able to perform substantial gainful employment was not supported by substantial evidence, because the ALJ failed to consider the opinion of at least one of Plaintiff's treating physicians.

It is well established that the findings and opinions of treating physicians are entitled to substantial weight. The case law in this circuit has stated that if adequately supported by objective findings, and if uncontradicted by other substantial medical evidence of record, a treating physician's opinion of disability is binding on the Social Security Administration as a matter of law. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference"); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (same); *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same); *Bowie v. Harris*, 679 F.2d 654, 656 (6th Cir. 1982); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980). The administrative decision could reject a properly supported treating physician's opinion of disability if the record contains "substantial evidence to the contrary." *Hardaway v. Sec'y of HHS*, 823 F.2d 922, 927 (6th Cir. 1987).

Under the Social Security Administration regulations, the Commissioner will generally give more weight to the opinions of treating sources, but it sets preconditions for doing so. 20 C.F.R. §404.1527. The Commissioner will only be bound by a treating

source opinion when it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in your case record." 20 C.F.R. § 404.1527(d); *See also*, S.S.R. 96-2p.

It is a bit of an overstatement on the part of Plaintiff to argue that the ALJ rejected the medical opinions of Dr. Parada a treating physician and Dr. Halgren a consulting psychologist. The ALJ took into consideration the medical diagnosis of autism/Asperger's Disorder, but afforded little weight to the doctors' opinions regarding the Plaintiff's ability to work. A statement made by a medical source as to disability or inability to work does not automatically result in the conclusion that a Plaintiff is disabled for purposed of Social Security and disability benefits. *See* 20 C F R §§ 404.1527(e)(1) and (3). These are areas of decision reserved to the Commissioner and do not fall within the scope of medical decisions to which the Commissioner must give added weight. 20 C.F.R. § 404.1527(e) and S.S.R. 96-5p.

ALJ Welsch concluded that the opinions of the two doctors as to Plaintiff's abilities were inconsistent with Plaintiff's actual level of functioning (R. 26). Albeit the Plaintiff's mental functioning was limited in certain, the Plaintiff failed to establish that he was entirely unable to work. Plaintiff could perform activities of daily living, live independently, perform volunteer work, cook , perform household chores, operate a computer and internet, read the newspaper, drive a car on a daily basis, maintain social interactions with family, customers, co-workers and supervisors, graduated from high school and obtained a degree in culinary arts from a community college and was maintaining employment at Wal-Mart as a stock person at the time of the hearing (R. 25, 376-377, 388-392). Based on the record and these findings, the ALJ found that Plaintiff

retained the ability to work at jobs that exist in significant numbers in the national economy.

Plaintiff contends that because of his diagnosis of Asperger's Disorder, he meets or equals the criteria of the mental health listing 12.10. It is Plaintiff's burden, not the Commissioner's, to set forth medical evidence demonstrating that an impairment meets or equals a listed impairment. *Listenbee v Secretary of Health and Human Services*, 846 F 2d 345, 350 (6th Cir 1988). The "B" criteria assess the claimant's ability to handle activities of daily living, function in a social setting, maintain concentration, persistence and pace, and whether or not he has experienced repeated episodes of decompensation, each of extended duration. 20 C F R Pt 404, Subpt P App 1, § 12.10.

There exists a paucity of evidence provided by Plaintiff to support a finding that he could not work due to a mental health disorder. While there is mention of the Asperger's Disorder or at least its possibility from Dr. Parada's and Dr. Batterbee's reports, there was little evidence provided on Plaintiff's functional loss due to this condition. It appears that social worker, Jeanne Gra at the North Central Community Mental Health Center ruled out Asperger's Disorder, finding on Axis I that Plaintiff had a pervasive development disorder NOS and depressive disorder (R. 159). She noted in her report that Plaintiff was a hard worker, a good conversationalist, gets along well with co-workers, enjoys close family relationships and attends movies and craft shows although she noted he impulsively quit jobs and relocated (R. 150, 154 and 159). Ms. Bachman-Moran made specific findings as to the functional abilities Plaintiff retained, which included functioning at the normal range of intelligence with signs of superior range in some areas, good social interactions, ability to take care of his daily needs

maintain and apartment, cook, clean, prepare meals and to the lack of behavioral challenges. The primary existence of Plaintiff's alleged disability is his pattern of quitting jobs. Dr. Parada and Dr. Batterby conclude this is caused by Plaintiff's mental impairment which cannot be controlled. On the present record, reasonable minds could differ as to whether Plaintiff could maintain employment if he chose to do so. On such a record, ALJ Welsch was in her legitimate "zone of choice" and the Court shall not interfere with her factual determination.

Taking into account the diagnosis and the specifics as to the Plaintiff's residual functioning, ALJ Welsch in evaluating the requirements for functional loss, found that the Plaintiff's condition did not satisfy the mental health listing's requirements of the "B" criteria., because he possessed no more than a mild or slight limitation in performing daily life activities, mild difficult maintaining social interactions, moderate concentration deficits and no repeated episodes of decompensation (R. 24-25). The ALJ's findings were supported by substantial evidence in the record, accordingly, the ALJ's decision should be affirmed.

## IV.     Recommendation

For the reasons stated above, it is Recommended that Plaintiff's Motion for Summary Judgment be DENIED and Defendant's Motion for Summary Judgment be GRANTED. The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932

F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise other issues with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachiss Local, 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: September 27, 2007            s/ Steven D. Pepe
Ann Arbor, Michigan                  United States Magistrate Judge

CERTIFICATE OF SERVICE

I hereby certify that on <u>September 27, 2007</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: <u>James A. Brunson, James B. Rinck</u>, and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants: <u>Social Security Administration - Office of the Regional Counsel, 200 W. Adams, 30th. Floor, Chicago, Il 60606</u>

s/ James P. Peltier
Courtroom Deputy Clerk
U.S. District Court
600 Church St.
Flint, MI 48502
810-341-7850
pete_peltier@mied.uscourts.gov